## PROPRIETORS OF ENFIELD *vs.* DAY.

Where a grant of a township was made, one line of which was defined as commencing at a given monument, and running certain courses and distances " by the line of another town," where such courses and distances did not coincide with such line—*Held*, that the grant extended to, and was governed by, the line of the town, as the more certain boundary, such line having been previously run out and located.

A grant of land by the government is equivalent to conveyance with livery of seizin.

Where land has been previously granted by the government, and a re-entry upon a portion of the land and new survey of the same has been made by them to correct a supposed error, and the government re-grants the land to another—*Held*, that such proceedings will divest the seizin of the first grantee ; and, after a lapse of twenty years, without re-entry by the first grantee, such second grant will become a perfect title.

WRIT OF ENTRY, to recover a tract of land situated in Enfield. A diagram of the lines of Enfield and of the adjoining towns will be found in 5 *N. H. Rep.* 281, *Enfield* vs. *Permit.*

The tenant originally pleaded *nul disseizin.* Subsequently leave was granted to file a plea in bar of the further maintenance of the action, " that the proprietors of Grantham were, on the 20th day of August, 1834, seized of the demanded premises in their demesne as of fee, and by their deed of that date conveyed the same to the tenant."

The plaintiffs replied that the proprietors of Grantham were not seized, as was alleged, of the demanded premises, on the 20th of August, 1834, and issue was taken on this fact.

The demanded premises consist of part of a gore of land, now situated within the town of Enfield, adjoining Grantham; but it is a matter of controversy whether the gore belongs to the proprietors of Enfield, or Grantham.

The charter of Enfield was granted July 4, 1761, commencing at the south-east corner of Lebanon, which was a known monument; thence running south $68°$ east, $6\frac{3}{4}$ miles; thence north $43°$ east, $5\frac{1}{2}$ miles; thence north $58°$ west, $7\frac{1}{2}$ miles, to the north-east corner of Lebanon; thence, by the east side of Lebanon, to the first bound mentioned.

The charter of Grantham was granted the 8th of June, 1767, beginning at the south-east corner of Lebanon, or, as named in the charter, the south-west corner of Enfield, thence running *south $58°$ east, by the south line of Enfield, $6\frac{3}{4}$ miles, to the south-east corner of* Enfield, which line is the north line of the township of Grantham.

The tenant, in order to show the time when the lines of the town of Enfield were run and established by the proprietors, and that the south line of the town was run south $68°$ east, as specified in their charter, offered various certified copies of extracts from the records of the proprietors of Enfield, in relation to the running of this line and the location of lots in conformity to it.

It was proved that there was a plainly marked line in 1832 and 1833, extending from the south-east corner of Lebanon, $6\frac{3}{4}$ miles, on the course south $68°$ east, wherever the original growth was left, which corresponded in course and length with the charter of Enfield, and in age with the vote of the proprietors appointing a committee " to settle the bounds of the township," June 20, 1765, the report under which was received March 11, 1766.

It was also in evidence that the range lines of the two

south tiers of lots in Enfield conformed to the line running south 68° east, and that the dividing lines betwixt said lots compared, in the points of compass, with the easterly line of Enfield, as described in the charter. The same was the case with certain ranges of fifty acre lots north of the first and second range, and adjoining the same.

Certain deeds were offered, of conveyances of lots of land, part of the first and second ranges of lots, which lots were bounded upon a line south 68 degrees east, and were held and occupied only to that line ; in a portion of which deeds the lots bounded on the line were described as bounding on the north line of Grantham.

It also appeared in evidence, that an ancient line was run south 58 degrees east from the south-east corner of Lebanon, extending across the town of Grantham, estimated by the witnesses to have been run in 1771, and that the proprietors of Grantham had made no claim to this gore up to this time, other than the original entry under their grant.

The plaintiffs offered in evidence certain petitions to the New-Hampshire legislature, and proceedings thereon, in 1781 and 1802, by which, as they contended, the title to said land was conveyed to and vested in them. These proceedings are referred to and cited in the opinion delivered by the court.

From the evidence thus offered, it was contended by the tenant that the south line of Enfield having been run and established prior to the grant to Grantham, that Grantham was bounded on said line, and that the demanded premises, being south of the line, were included in the charter of Grantham, notwithstanding the course north 58 degrees east, named in the same ; and it was further contended, that the proceedings of the legislature in 1781 and 1802 could not affect any rights of ownership of the proprietors of Grantham or Enfield, but could only relate to and regulate the jurisdictional limits of the towns.

Verdict was taken for the plaintiffs, subject to be set aside

and judgment rendered for the defendant, should the court so direct on the above facts.

*Bell,* for the tenant, contended that the evidence offered by the plaintiffs was immaterial, for the reasons,

1. That the rights of the parties were fixed and determined by the state of things existing on the 8th of June, 1767, when the town of Grantham was chartered.

2. That the acts of the legislature under which the plaintiffs claim, were passed after 1780, when the rights of the proprietors were fixed, and were therefore invalid.

3. That these acts relate merely to the jurisdictional rights of towns, and not to the title to the land.

The land having been previously granted by the state, we should not infer that the legislature designed a farther grant of the same land, provided their acts will admit of a different construction, and in this case they may be construed as referring to the jurisdictional lines of the towns. But, if a different construction is holden, it is immaterial as to the decision of this case, because if Enfield was seized, Grantham was also seized ; and where there is a cotemporaneous seizin the owner cannot be disseized.

*Perley,* for the plaintiff, contended, 1. That the state by their committee had divested the proprietors of Grantham, by entry upon the land and a re-grant of the premises.

2. That the proprietors of Grantham had assented to these acts of the legislature, and were concluded by an acquiescence therein for more than fifty years.

3. That the proprietors of Enfield had held by possession for this term of time.

A grant from the government is equivalent to livery and seizin to the grantee. 5 *Co.* 95 ; 12 *Johns.* 81 ; 4 *Wheaton* 213 ; 8 *Cranch* 247. But in this case the state actually entered prior to the conveyance. If the proprietors of Grantham were originally seized, they were subsequently disseized.

The proceedings of the legislature cannot be regarded as having reference merely to the jurisdictional lines of towns; the contrary has been already settled, in 5 *N. H. Rep.* 280, *Proprietors of Enfield* vs. *Permit.*

*Bell,* in reply, contended, that in the case of the proprietors of Enfield *vs.* Permit, the tenant attempted to set up a title in the proprietors of Grantham, without claiming under them, but the court would not permit it. The question, then, never has been before the court where Grantham set up a title, and cannot be considered as judicially determined.

The proceedings of the legislature in 1781 and 1802, if they may be regarded as constituting a grant, overlapped the territory of the proprietors of Grantham, and can operate only as a conflicting grant. Where A. grants a tract of land to B., and subsequently grants the same land to C., and B. enters on one end, claiming the whole, and C. enters on the other end, and claims the whole, neither divests the other.

UPHAM, J.* The first question to be settled in this case is, the extent of the charter to Grantham. The facts necessary to determine this question are clearly found in the case. It appears that the charter of Enfield was first granted, and that the proprietors of Enfield went on soon after the date of their grant, and ran out their township, and established a well-marked line as the south line of the town, conforming to the terms of its grant, *"south sixty-eight degrees east."*

Some years after the establishment of this line, Grantham was chartered. It is situated immediately south of Enfield, and its north line is described as follows, viz : " beginning at the south-west corner of Enfield, thence running south *fifty-eight* degrees east, *by the south line of Enfield,* six and three-fourths miles, to the south-west corner of Enfield, which line is the north line of Grantham."

The point of compass given in this description does not

* PARKER, C. J., having been of counsel, did not sit.

conform to the south line of Enfield, as specified in its char-
ter, but it is, notwithstanding, described as bounded upon the
south line of Enfield; and, under the well-known rule that
monuments must govern, rather than courses and distances,
the limits of Grantham must be clearly holden to extend to
the south line of Enfield, it being then a well-known and
established line. Such is the legal effect of the grant.

The proprietors of Grantham, therefore, became seized of
the tract of land which has since been so long in controversy,
not only by virtue of their actual seizin, as derived by grant
from the government, but also by an immediate entry under
their grant, claiming in conformity to their title, and of course
to the entire legal extent of the township.

The case, therefore, starts upon the ground that Grantham
was originally clearly seized of the tract of land in contro-
versy. It remains for us to consider the effect of certain
proceedings, subsequently had by the legislature, in 1781 and
in 1802, in relation to the charters of these townships, to
determine whether these proceedings have changed in any
manner the legal rights of the parties.

To determine the intention of the legislature in these acts,
we must look to the original grievance, as set forth in the
petitions presented to that body. The first petition upon this
subject was drawn up January 5th, 1781, by the proprietors
of Canaan, and sets forth that "in drafting the charter of
Enfield a clerical mistake was made, in describing its south
line as running north *sixty-eight degrees east*, instead of
north *fifty-eight degrees east;* and that, as all the adjoining
towns were bounded upon that township, and had been
located upon it as it was intended and supposed to be granted,
the effect of this error, if persisted in, would be to interfere
with, and confound all the lines of the adjoining towns; and
that, unless the error was speedily corrected, owing to the
conflicting claims of the various proprietors it would occa-
sion a variety of distressing lawsuits as to the titles of the
settlers to their lands; would retard settlements upon these

townships, and would be greatly injurious to the state in general."

The legislature assigned a day of hearing upon this petition, and ordered public notice of the same to be given, by advertisements inserted three weeks successively in a newspaper, and by special service of notice on the proprietors of Grantham, Grafton, and Enfield, and on the selectmen of those towns.

In pursuance of these notices a hearing was had before a committee of the legislature, who reported that, in their opinion, there was a clerical mistake in describing the point of compass of the south line of Enfield, and they recommended that a committee of three persons should be appointed, to go upon the ground, hear the several proofs and allegations of the parties, and establish the boundaries between them, in a just and equitable manner.

This report was approved by the legislature, and an act was passed the 28th of March, 1781, the title of which was, "an act to authorize and empower Jeremiah Page, and Henry Gerrish, esquires, and Mr. William Chamberlain, to run out and settle the lines and boundaries of the town of Enfield and the townships of Canaan and Grafton, which are contiguous thereto, or dependent thereupon;" and these commissioners were instructed in said act to execute the duties of their commission, paying proper regard to the seniority of the charters to these towns, and their true intent and meaning.

The committee attended to this duty, and reported that they had commenced at the south-west corner of Enfield, which was a permanent bound, relative to which there had been no controversy; and run a line from thence south, fifty-eight degrees east, six and three-fourths miles, to an hemlock tree marked H. C., W. C., &c., as the south line of Enfield, and thence run other courses and distances, so as to define the entire limits of Enfield, and of course those of the towns adjoining and bounded thereon.

Many years afterwards it was ascertained that the report

Proprietors of Enfield *v.* Day.

of this committee was not returned to, or was lost from the files of the secretary's office, and in June, 1801, a petition was presented to the legislature, setting forth the previous proceedings, and the loss of the report of the committee; and praying that a copy of the same might be approved by the legislature, and placed on file in its stead. It represented, also, that there were about forty families peaceably settled, holding lands agreeably to the decision and determination of the committee, which they had occupied for nearly twenty years; and, in case the report and survey of the committee should not be considered valid, it might involve the peaceable inhabitants of said towns in expensive lawsuits, and inveterate animosities, and other evil consequences.

A day was assigned for the hearing of this petition at the next session of the legislature, and notice was ordered of the petition, by advertisement in the public papers; and at the next session, on the 18th of June, 1802, an act was passed, to establish and make valid the report of the former committee relative to the boundaries of the towns of Enfield, Canaan, and Grafton, and provided that a copy of their report, filed and recorded in the secretary's office, should be as valid and effectual to all intents and purposes as though their original report had been returned and remained on file in the secretary's office.

We have recited these proceedings somewhat at length, in order to determine the intention of the legislature as regards the rights of these proprietors.

It has been contended, that these proceedings of the legislature related solely to the jurisdictional territory of the towns, and did not affect the title to the land; and that we should presume this was their intention, if their acts will admit of this construction, as otherwise we impute to the legislature the injustice of re-granting land previously conveyed by them.

But, on a careful examination of the proceedings of the legislature, we think it clear that they proceeded on more

thorough grounds. They moved in the matter, as stated in the petitions of the *proprietors* of Canaan and Enfield, "to prevent a variety of distressing lawsuits relative to the titles to lands" in the several towns affected by the error, and not merely to change the jurisdictional lines of the towns. The legislature designed, unquestionably, to place all parties in interest in the same situation in which they would have been, had the error in the description of the south line of the township of Enfield never been made.

But this could be done only by divesting Grantham of any right she might have acquired to the land under the grant. This was attempted to be done by a new grant of the land to the proprietors of Enfield. But the enquiry arises, whether such new grant will pass the title to the land? In 10 *Pet. R.* 731, *New Orleans* vs. *The United States*, Mr. Justice McLean says: "It would be a dangerous doctrine to consider the issuing of a grant in such case by the government, as conclusive evidence of right in the power which issued it. On the face it is conclusive, and cannot be controverted; but if the thing granted was not in the grantor, no right passes to the grantee. A grant has been frequently issued by the United States for land which had been previously granted, and the second grant has been held to be inoperative. In a case recently decided in this court, where the government had granted land in the state of Ohio, as land belonging to the United States, which was found to be within the Virginia reservation in that state, to satisfy certain military claims, it was held that the title did not pass under the grant."

And in *Bagwell* vs. *Broderick*, 13 *Pet. R.* 436, it is held that where the title to land has passed out of the United States by conflicting patents, there can be no objection to the practice adopted by the courts of a state to give effect to the better right, in any form of remedy the legislature or courts of the state may prescribe.

We have already holden, that a mere grant of land by the government is ordinarily evidence of an actual seizin at the

time in the government, and vests such seizin in the grantee. 8 *N. H. Rep.* 512, *Enfield* vs. *Permit;* 8 *Cranch* 246; 5 *Co.* 94; 3 *Greenl.* 341, *Hill* vs. *Dyer.*

In this case we are clearly of opinion the seizin would not pass by the mere effect of the second grant; but was there not such a previous re-entry and assertion of right on the part of the government, as to constitute, together with the grant, a conveyance with livery of seizin? An entry upon the land by the government agents, and the running anew and re-marking of lines, with the express design of a re-conveyance to rectify a former mistake, would seem to be evidence sufficient to show an actual possession in the government of any given tract.

If this be so, there was not only a new grant to the proprietors of Enfield, of the land in controversy, but a grant attended with delivery of possession by the government.

If the form of the grant should be objected to, our reply is, that the proceedings of the legislature in this respect have already been adjudged by this court sufficient to convey the land, and that no particular set of terms or mode is necessary to constitute a legislative grant. 5 *N. H. Rep.* 280, *Enfield* vs. *Permit;* 6 *Pick.* 409, *Ward* vs. *Bartholomew.* It has been objected that, in the case of Enfield *vs.* Permit, this point was not directly in issue. This is so; but the authorities there cited, and reasons assigned for the opinion of the court, on farther consideration we regard as well sustained in principle, and they fully meet our approbation.

But a farther question remains for consideration, which is, whether the proprietors of Grantham acquiesced in the re-grant of this tract, and the seizin and possession of the same by the proprietors of Enfield, for the term of twenty years?

It is clear, from the facts shown in the case, that neither since, nor before these proceedings of the legislature, the proprietors of Grantham ever entered upon, or claimed this gore of land in any manner, other than by the entry under their original grant. It is in evidence, that a line in Gran-

tham was run north 58 degrees east, in 1771, by whom does not appear ; but there is strong reason to believe that, at the time it was run, it was run as the north line of Grantham, and was supposed to be the true line ; and nothing has transpired since that time to show a claim on their part beyond that line, until recently, and long after twenty years had transpired subsequent to the entry and re-grant of the land by the legislature.

The proceedings of the legislature were had on public notice and actual service on the proprietors of Grantham. They also had full knowledge of the subsequent proceedings of the proprietors of Enfield, in their entry upon and frequent sales of portions of this gore of land, claiming the whole under their grant from the state, and must be regarded as acquiescing in such adverse possession and claim. It is now too late for the proprietors of Grantham to assert their title. A conveyance of the land by them at this time is wholly inoperative.

The claim, therefore, which the tenant has attempted to set up by virtue of a conveyance from the proprietors of Grantham, is of no avail, and there must be

*Judgment on the verdict for the plaintiffs.*